PETER C. COLLINS (#0700)
PETER C. COLLINS, L.L.C.
623 East 2100 South
Salt Lake City, UT 84106
Telephone: (801) 746-5788
Facsimile: (801) 467-1800
pete@bcmlaw.net

Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JOHN FEHER and VIRGINIA FEHER,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>KENNETH "BUZZ" BATES,<br><br>　　　　Defendant. | PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 2:07cv00732<br><br>Judge Dale A. Kimball |

Plaintiffs John and Virginia Feher through their legal counsel submit this

Memorandum in Opposition to defendant's Motion for Summary Judgment (styled

"Motion for Summary Judgment that Mr. Bates is Not Responsible for the Acts of

Unknown Third Parties").

As a review of plaintiffs' operative pleading, the Amended Complaint (filed

December 21, 2007), will show, plaintiffs are not contending that defendant is

"responsible for the acts of unknown third-parties."[1]  And consideration of the following points and authorities should cause the Court to conclude that defendant is not entitled to summary judgment.

## I.    RESPONSE TO DEFENDANT'S "STATEMENT OF UNDISPUTED MATERIAL FACTS"

Plaintiffs respond, for purposes pertinent to the instant Motion, as follows to defendant's "Statement of Undisputed Material Facts":

1.    Plaintiffs do not dispute the contents of paragraph 1 of defendant's Statement.

2.    Although paragraph 5 of the Amended Complaint (the citation advanced by defendant) does not say anything about a cow's having escaped through a gate, plaintiffs do not dispute the contents of paragraph 2 of defendant's Statement.

3.    Although paragraph 5 of the Amended Complaint (the citation advanced by defendant) does not use the term "wandered," plaintiffs do not dispute the proposition that the cow struck by Mr. Feher's truck had walked onto Highway 191.

4.    Although paragraph 4 of the Amended Complaint (the citation advanced by defendant) does not state that plaintiff John Feher failed to see the cow in time to stop, plaintiffs do not dispute the contents of paragraph 4 of defendant's Statement.

---

[1] It is also perhaps here worth noting that, contrary to the suggestion that appears in the second sentence of the Introduction to defendant's Memorandum, the Fehers have never claimed that Mr. Bates "is liable because he was somehow negligent in allowing a gate to remain <u>unlocked</u>." (Emphasis added.)  The Fehers acknowledge that Mr. Bates was not, by law, allowed to lock the gate in question because the roadway over which it sat when closed was open to public use.

5.      Plaintiffs do not dispute the contents of paragraph 5 of defendant's Statement.

6.      Plaintiffs do not dispute the contents of paragraph 6 of defendant's Statement.

7.      Plaintiffs do not dispute the contents of paragraph 7 of defendant's Statement.

8.      Plaintiffs respond as follows to paragraph 8 of defendant's Statement: plaintiffs, noting the ambiguity and importance (in the context of this case) of the phrase "leave the gate open," do not contend that Mr. Bates himself opened and then failed to close the gate through which the cow escaped and in that sense do not dispute the contents of paragraph 8.  However, plaintiffs contend that there is a question of fact as to whether the gate had been "left open" by an unknown person and been allowed to remain open by Mr. Bates, prior to the time Mr. Bates left town for the trip to Las Vegas in which he was engaged at the time of the subject collision.  In this regard, see Mr. Bates's deposition testimony, at 136 (cited portions of Bates deposition are attached hereto as Exhibit A).  Mr. Bates there testified that his efforts with respect to checking on gates had remained essentially the same from the time of the collision through the time of his deposition.  And see the affidavit statement of plaintiff Virginia Feher (copy of her Affidavit is attached hereto as Exhibit B) in which she states that every time except one that she checked the status of the gate in question (the one at the Mid-America Pipeline facility building at approximately milepost 117 of Highway 191) in the winter of 2007-08

3

the gate was <u>open</u>, not closed.  (The subject incident occurred on December 6, 2006;

Mr. Bates's deposition was taken on May 2, 2008.)

9.    Plaintiffs do not dispute the contents of paragraph 9 of defendant's

Statement.

10.    Plaintiffs respond as follows to paragraph 10 of defendant's Statement:

plaintiffs acknowledge that Mr. Bates testified that he checked on the status of the gates

before he left town, but, given his testimony and the Affidavit of Mrs. Feher cited in the

foregoing response to paragraph 8 of defendant's Statement, plaintiffs contend there is a

question of fact with respect to the fact and quality of Mr. Bates's claimed pre-Las Vegas

trip inspection.

11.    Plaintiffs incorporate, in response to paragraph 11 of defendant's

Statement, the contents of the foregoing paragraphs 8 and 10.

12.    Plaintiffs respond as follows to the contents of paragraph 12 of defendant's

Statement:  plaintiffs, noting the ambiguity and importance (in the context of this case) of

the phrase "leave the gate open," have no evidence that Mr. Leech himself opened and

then failed to close the gate and in that sense do not dispute the contents of paragraph 12.

However, the gate was allowed to remain open, on Mr. Leech's watch, in the sense that it

is clear -- regardless of whether Mr. Bates had been out of town for only two days, as

Mr. Bates testified (Bates depo. at 47), or for approximately a week, as Mr. Leech

testified (Leech depo. at 14; cited portions of Leech deposition are attached hereto as

Exhibit C) -- that the cow walked through an open gate while Mr. Leech was looking after things for Mr. Bates.

13.    Plaintiffs dispute the contents of paragraph 13 of defendant's Statement. What Mr. Leech testified to was that he drove that stretch of highway exactly one time from the time Mr. Bates embarked on his trip to Las Vegas until the time of the incident. Leech depo. at 18. Mr. Leech also testified that on that occasion he was asked by Mr. Bates to go to the scene after Mr. Bates learned that he had four or five cows out. Leech depo. at 20-21. Mr. Leech also explained that his *modus operandi* for checking on the gates was the following: if he happened to be driving by he would look to see what he could see from the highway. Leech depo. at 16-17.

14.    Plaintiffs are unable effectively to respond to paragraph 14 of defendant's Statement because they do not understand exactly what is intended by the term "bisected" in the context of that paragraph. Also, the citation advanced by Mr. Bates (page 125 of Mr. Bates's deposition) does not support the posited proposition. Plaintiffs do not deny that Mr. Bates kept his cattle, during some parts of the year, on the east side of Highway 191 and that during other parts of the year, including the wintertime (when the subject incident occurred), he kept his cattle on the west side of Highway 191. Nor do plaintiffs deny that there are dirt roadways dedicated to public usage (including the roadway over which the gate involved in this case was left open) that are on the public lands used by Mr. Bates to pasture his cattle.

15.     Plaintiffs do not dispute the contents of paragraph 15 of defendant's Statement and acknowledge that Mr. Bates was prohibited from locking the gates.

## II.    STATEMENT OF ADDITIONAL FACTS

Plaintiffs bring to the Court's attention the following facts, to be taken as true for purposes of defendant's instant Motion:

1.     Mr. Bates runs a cow-calf operation and had, as of the time of the December 2006 incident, 300-350 head of mother cows. Bates depo. at 20-21; Answer to Interrogatory No. 15 of Plaintiffs' First Set of Interrogatories (copy attached hereto as Exhibit D).

2.     Mr. Bates's cow that was struck by the truck Mr. Feher was driving, late on the night of December 6, 2006, was a Black Angus. Bates depo. at 24.

3.     As results of the collision Mr. Feher sustained, among other injuries, a badly fractured leg that has required multiple surgeries. A summary of pertinent health care charges is, to give the Court a flavor of the severity of Mr. Feher's injuries, attached hereto as Exhibit E.

4.     The land on which Mr. Bates was pasturing his cattle at the time of the incident is an area where he keeps them between November 1st of one year and May 6th of the next year. Bates depo. at 42-43.

5.     Mr. Bates uses "day help" in his cattle operation, and the only "day-help" he had between November 1, 2006 and the date (December 6, 2006) of the subject incident was his father-in-law, Terry Leech. *Id.* at 46.

6.     Mr. Bates began his public pasture land cattle operation sometime in 2005, when he took over the operation of Mr. Roy Krist.  *Id.* at 14.

7.     Mr. Bates testified that he is always called by the Grand County Sheriff's office when a cow is hit or out on Highway 191.  *Id.* at 48 (although the incident occurred in San Juan County, it was not too far across the Grand County/San Juan County line and near Moab; that is, presumably, why the Grand County Sheriff's office was involved).

8.     Mr. Bates first testified that, in the less than two-year period from the time he took over the Krist operation until the time the incident occurred, he had gotten approximately twenty calls from a sheriff's office informing him that there was a cow outside the gates he maintained and monitored that was determined to be his cow.  Bates depo. at 51.

9.     Mr. Bates then qualified that answer by saying that he guesses half of those calls involved his cows.  *Id.*

10.     Mr. Bates then testified that at least three times between the time he took over the Krist operation and the time the incident occurred, it was determined to be his cow that was outside its enclosure.  *Id.* at 53.

11.     Mr. Bates has acknowledged that he had exclusive rights to pasture his cows in the area in which he was pasturing them at the time of the subject incident (though one or more neighboring ranchers may have had cows pastured on the opposite (east) side of Highway 191 from where Mr. Bates had his cows pastured at the time of the incident).  *Id.* at 54-55.

12.     Mr. Bates has testified that he was concerned about public safety regarding the possibility of an incident, such as the subject incident, in which a cow is struck on Highway 191 by a motorist. *Id.* at 52.

13.     When first asked what, if anything, he instructed Mr. Leech to do with his cattle operation while he was out of town in Las Vegas, Mr. Bates responded "I don't recall." *Id.* at 56.

14.     Then, when asked what kind of responsibilities he gave Mr. Leech to take care of when he left town for his trip to Las Vegas, Mr. Bates testified: "He fed some cattle at the ranch, fed my horses, that's about it." *Id.* at 79.

15.     When asked specifically how often he told Mr. Leech to check on the gates while he was gone, Mr. Bates testified: "I don't recall." *Id.* at 81.

16.     Mr. Bates has acknowledged that there were fences of both sides of Highway 191. *Id.* at 132.

17.     Mr. Leech has had no experience in the cattle business besides the work he's done with Mr. Bates, his son-in-law.  Leech depo. at 10.

18.     Mr. Bates has acknowledged that it's his responsibility to keep cattle off the highway and he acknowledges that to do that the fence and the gates have to be safe. Bates depo. at 74.

19.     Mr. Bates has no idea as to how many gates there are that can be opened and closed on the public land on which he pastures his cattle. *Id.* at 75.

20.     Mr. Bates acknowledged that, of all the gates for which he is responsible, for he can think of only one that has more vehicular traffic than the one through which he says the cow came, and that he did not have his cattle in the area where that other gate is at the time of the incident.  *Id.* at 75-77; 87.

21.     When asked whether all the gates that he wants to make sure are closed are essentially the same distance from the highway, Mr. Bates responded that he did not know.  *Id.* at 78.

22.     The gate in question is near Highway 191.  See photograph (looking eastward from the gate toward the highway) attached hereto as Exhibit F (marked as Exhibit 6 to Bates deposition) and Bates depo. at 77.

23.     The gateway through which Mr. Bates says his cow escaped runs east and west just north of the Mid-America Pipeline Company facility building.  Bates depo. at 37-40 and Ex. 3 to Bates depo. (Exhibit G hereto).

24.     The gateway is depicted (with the camera facing north) in the photograph that is attached as Exhibit H hereto (Ex. 4 to Bates depo; see Bates depo. at 71).

25.     The "wire gate" used to close the gateway is depicted, in the down position, in the photograph that is attached as Exhibit I hereto (Ex. 5 to Bates depo; see Bates depo. at 72-73).

26.     Mr. Bates testified that his practice was to check on the gates every day once a day when he was in town but that he does not remember what time he checked them and that he cannot give any approximation on that.  *Id.* at 81.

9

27.    Mr. Bates has informed Mr. Leech that "we have a lot of trouble with gates being left open" and that if Mr. Leech should happen to be driving by he should look at the gates and if he saw any open gates he should close them.  Leech depo. at 16.

28.    When asked if that was the instruction Mr. Bates gave him, Mr. Leech testified "it's not really an instruction.  It's just an understanding.  He stated -- he says if you're going by and you see a gate that's open, close it." *Id.*

29.    Mr. Bates gave Mr. Leech no additional instruction. *Id.* at 17.

30.    From the time Mr. Bates left town until the time the incident happened, Mr. Leech drove the stretch of the highway where Mr. Bates had his cows pastured exactly one time. *Id.* at 18.

31.    The one time Mr. Leech did that was in response to a call he'd gotten from Mr. Bates, two or three days before the subject incident occurred, regarding a call that Mr. Bates had received about cows out of their enclosure. *Id.* at 21.

32.    On that one occasion on which he concerned himself with possible open gates after Mr. Bates had left town, Mr. Leech determined that snow had rendered a cattle guard (cattle guards are sometimes used in lieu of gates) ineffectual, allowing cows to escape. *Id.* at 19-20.

33.    On that occasion, involving the escape of four or five cows, Mr. Leech claims he herded the cows back down the road and inside the enclosure and put up a gate over that cattle guard. *Id.* at 20-21.

34.    That gate is located at the bottom of Blue Hill. *Id. at 19.*

35.    The bottom of Blue Hill is located close to milepost 114 where, according to the subject police report, four or five cows were found in the aftermath of the subject incident. See last page of subject police report (copy attached hereto as Exhibit J).

36.    The subject collision occurred near milepost 116. See police report.

37.    Mr. Leech testified that the last time prior to the subject incident that he'd driven by the gate (located at approximately milepost 117) where Mr. Bates claims the cow that was struck by Mr. Feher escaped, was approximately two or three days prior to the subject incident (the same day that he'd responded to the call about cattle out near the bottom of Blue Hill). Leech depo. at 36-37.

38.    Mr. Leech has acknowledged that, the way he did his gate-checking, he could tell only during the daytime whether a gate was open or shut. *Id.* at 46.

39.    Mr. Leech has also acknowledged that, when he checked on the status of the gates, he would just look to see if there was anything that he could see from the highway. *Id.* at 47.

40.    Virginia Feher, the wife of John Feher, has by Affidavit stated that, in order to see whether the gates are open or closed at nighttime, it is necessary for her to pull off the highway. Affidavit of Virginia Feher (copy attached hereto as Exhibit B).

41.    Mr. Bates has acknowledged that he has put up "please close gate" signs but claims that he cannot remember whether there was a "please close gate" sign on the gate that he says was left open in connection with the subject incident. Bates depo. at 84.

42.    Mr. Bates can think of no negative ramification, with respect to public safety, of putting "please close gate" signs up.  Bates depo. at 86.

43.    When asked where he got the idea to put signs up where he did put them up, he said "maybe to help the public, remind them to please close the gate." *Id.* at 86.

44.    Mr. Bates acknowledged that he had no program to make sure he put such signs up on all of the gates. *Id.* at 86-87.

45.    Mr. Bates acknowledges that it never occurred to him to put a sign up on any gate that says "some people leave the gate open, it creates a public danger, please make sure you close it" or one saying anything about cows being in the area.  Bates depo. at 108.

46.    Mr. Bates never, after the occurrence of the subject incident, asked Mr. Leech how frequently he had been checking on the gates since Mr. Bates left town. Bates depo. at 89-90.

47.    Mr. Leech testified that, while working for the Grand County Road Dept. (where he worked many years before his retirement), if he saw an open gate that had a sign on it that said please close it, he would close it.  Leech depo. at 12.

48.    Mr. Leech also testified, when asked whether he would close a gate that did not have a sign on it, he would "probably not" close it "[b]ecause who knows why that gate was open.  The cattlemen may have left it open so, you know, he had access to both sides for whatever reason."  Leech depo. at 12.

12

49.     Mr. Bates acknowledged that it never occurred to him that "plan A" (his gate-checking routine) was not completely solving the problem of his cows escaping their enclosures.  Bates depo. at 108.

50.     Mr. Bates could not provide an approximation as to how many gates he needs to concern himself with during the time of year the subject incident occurred.  *Id.* at 120.

51.     Mr. Bates testified that it was his belief that there was no set of circumstances where he could be found liable if one of his cows should get through an open gate.  Bates depo. at 124.

52.     Mr. Bates testified that it never occurred to him that, because there was such a risk of gates being left open, he should, in the interest of the safety of the motoring public, consider doing something else with his cattle operation during the subject time of year.  Bates depo. at 128.

53.     Plaintiffs' liability expert, Thomas L. Stoll, a professional cattle man, has submitted an expert report, copy attached hereto as Exhibit K, setting forth his views regarding, among other things, how the incident likely occurred and Mr. Bates's failure to exercise reasonable care.  A copy of Mr. Stoll's resumé is attached hereto as Exhibit L.

## III.    ARGUMENT

**THE FEHERS HAVE PLENTY OF EVIDENCE TO CARRY THIS CASE TO A JURY, AND MR. BATES'S EFFORTS TO MAKE THEIR CASE INTO SOMETHING IT NEVER HAS BEEN IS UNAVAILING.**

Although it has, given the thrust of Mr. Bates's argument, probably not been necessary to do so, the Fehers have provided the foregoing factual statement to give the Court a flavor of what the trial evidence will be.  Given things including but not limited to the laxity of Mr. Bates's own efforts; Mr. Bates's selection of Mr. Leech to act in his stead; Mr. Bates's failure to instruct Mr. Leech; the fact that Mr. Leech did next to no monitoring of the gates between the time Mr. Bates left town and the time of the incident; Mr. Bates's acknowledgment of a problem with gates being left open and the history of numerous of his cows being outside their enclosures where they could easily walk onto the highway; Mr. Bates's failure to even consider a "plan B" for the execution of his acknowledged responsibility to keep his cows enclosed; and Mr. Bates's acknowledgment that posting signs would be a good idea and his inability to say whether the subject gate ever had a sign on it (it is doubtful that it had such a sign or Mr. Bates would have known and testified to that), there is an abundance of evidence from which a jury could reasonably conclude that Mr. Bates failed to exercise reasonable care, and/or acted willfully, and that that failure led to Mr. Feher's subject severe injuries.

Mr. Bates, appearing implicitly to recognize that that is so, has constructed an argument that is creative but not availing to him.

Mr. Bates's contention appears to be that because the cow escaped through an open gate, rather than a breached fence, and because he is prohibited from underlining locking the gates and preventing public access, and because neither he nor his surrogate, Mr. Leech, personally opened the gate and then failed to close it, and because the gate was

14

presumably directly left open by someone for whose conduct Mr. Bates has no legal

responsibility, Mr. Bates cannot be found liable. Mr. Bates has, in support of his

contention, constructed an argument that purports to be built around the "special

relationship" doctrine.

One essential fallacy of Mr. Bates's argument is that the Fehers have never

claimed a special "special relationship" of any kind. As stated at the outset of this

Memorandum, the Fehers do not contend that Mr. Bates is legally responsible for the

action of whatever unknown person presumably left the gate open when he or she was

leaving the public lands across the road leading to which the gate sits when it is closed.

If the Court ultimately determines (that issue is not presently before the Court) that

there is sufficient evidence to present to the jury Mr. Bates's affirmative defense that an

unknown party wrongfully left the gate open, the jury may find it fit to apportion fault to

that person. But, as in any comparative negligence case, that does not mean that

Mr. Bates should escape liability. The concept of comparative fault, under Utah statutory

law, is well established in cases involving unknown third parties. See, *e.g.,* Field v.

Boyer Co., 952 P.2d 1078 (Utah 1998). Also, for a case involving somewhat similar

facts and defense contentions, see Cooper v. Eberly, 508 P.2d 943 (Kan. 1973). There

the court, in the course of rejecting the defendant's contention that he was, as a matter of

law, not legally responsible for the plaintiff's injuries because a gate through which the

defendant's horses had escaped appeared to have been left open by an unknown third

person, explained:

The rule applicable to this case is stated in §49, Restatement (Second) of the Law of Torts, as follows:

"If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby."

Comment *b* under the above restatement rule states:

"The happening of the very event the likelihood of which makes the actor's conduct negligent and so subjects the actor to liability cannot relieve him from liability. The duty to refrain from the act committed or to do the act omitted is imposed to protect the other from this very danger. To deny recovery because the other's exposure to the very risk from which it was the purpose of the duty to protect him resulted in harm to him, would be to deprive the other of all protection and to make the duty a nullity."

508 P.2d at 950.

The Fehers are bringing this action pursuant to a Utah statute that has not been cited by Mr. Bates. That statute, Utah Code Ann. §41-6a-407, provides, in pertinent part:

(1)(a) A person who owns ... any livestock may not willfully or negligently permit any of the livestock to stray or remain unaccompanied on a highway, if both sides of the highway are separated from adjoining property by a fence ....

...

(3) In any civil action brought for damages caused by collision with any domestic animal or livestock on a highway, there is no presumption that the collision was due to negligence on behalf of the owner ... of the domestic animal or livestock.

The Fehers have through their counsel been aware, since before the outset of this litigation, of this statute and have developed the evidence with an eye toward proving that Mr. Bates negligently or willfully allowed the cow to be or remain on Highway 191 at the time it was struck by the truck being operated by Mr. Feher. And they realize that there

is no presumption of negligence and that they must affirmatively show negligence or willfulness.

The Fehers have through their counsel also been aware, since prior to the institution of this litigation, of a pertinent Tenth Circuit case that applies Utah law. That case is Hyrum Smith Estate Co. v. Peterson, 227 F.2d 442 (10th Cir. 1955). In that case a jury trial resulted in a verdict for the plaintiff. The Tenth Circuit affirmed the judgment entered on that verdict. The Fehers acknowledge that there is no reason to think that the defendant in that case made a "no special relationship" argument, but there is no more reason to think that such an argument would have succeeded in that case than in this case.

In the Peterson case, the plaintiff was injured when one of five horses that were in a ditch along a public highway suddenly started across the highway in front of the plaintiff's motorcycle and one of those horses was struck by the motorcycle. The defendant contended that there was insufficient evidence to establish ownership of the horses. Here there is no doubt that Mr. Bates owned the cow. The defendant-appellant in Peterson also contended that there was insufficient evidence of negligence on the defendant's part in permitting the horses to be upon the highway. The Tenth Circuit, applying the language of the statute that was a predecessor to Utah Code Ann. §41-6a-407 and whose language was, for present purposes, essentially identical to §41-61-407, stated the following in response to the defendant's contention of insufficient evidence regarding negligence:

The factual situation then is this. Here is a gate leading to appellant's grazing land, through which these horses could have escaped onto a main traveled highway, which gate appellant maintained and checked. It was open on the day these horses escaped onto the highway and it could have been open for as much as two weeks without being checked by appellant. <u>Whether such supervision of a gate through which the horses could have escaped onto a main arterial highway was adequate to absolve appellant of negligence constituted an issue of fact which was properly submitted to the jury.</u>

*Id.* at 444. Here a jury could reasonably find, from a gate monitoring/supervision perspective alone, that Mr. Bates failed to exercise reasonable care. And Mr. Bates knew that there was a history of his cows escaping through open gates (there is no mention of like knowledge in the <u>Peterson</u> case). Mr. Bates failed to alter his practices in response to that history. His "supervision" consisted only of checking at, he says, an unspecified time each day as he drove Highway 191 while he was in town. His inspection did not involve pulling off the road. It did not involve checking the status of the gates at night. It did not even involve stopping. There is, at a bare minimum, a question of fact as to whether the instructions, if any, he gave Mr. Leech were adequate. Mr. Bates says he was only gone for two days but Mr. Leech says it was approximately a week. Mr. Leech says that all he did was that <u>if</u> he happened to be driving by the area where the gates were located, he was supposed to look, as he drove by, to see what he could see regarding open gates. He says that the only time in that one-week period that he even concerned himself with the condition of the gates was when he got a call of cows being out on the highway and went to put them back in. As with the <u>Peterson</u> case, a jury could, on these facts alone, find Mr. Bates negligent.

Another aspect of this case worth considering is the question of what else, besides checking on gates, Mr. Bates should reasonably have been expected to undertake in the interest of public safety. One such thing might simply be putting a sign on the gate asking people to close the gate (something that was apparently not done). When Mr. Leech himself saw a gate with such a sign on it, he would close it. There is no reason to think that there was a sign on the gate in question in this case; and, presumably, if there was such a sign, it would have been heeded.

Mr. Leech's observations are, with respect to the sign question, also worth noting. As mentioned in the Statement of Additional Facts section (¶¶ 47, 48 above), Mr. Leech's own practice appears to be that if there is no sign on a gate he leaves it open. That is, presumably, what motivated the unknown person who apparently left the gate open after using the road to leave it open.

The Fehers here bring to the Court's attention the case of <u>Rhiness v. Dansie</u>, 472 P.2d 428 (Utah 1970), the only reported Utah state court opinion that appears to involve interpretation and application of <u>Utah Code Ann.</u> §41-6a-407.[2] In <u>Rhiness</u> the Utah Supreme Court affirmed a directed verdict in a situation where (unlike here) "[t]he defendant had been at the property on the day in question and observed at the time he left that the gate was securely fastened" (*id.* at 429), and where (unlike here) "[t]he

---

[2] In <u>Hornsby v. Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints</u>, 758 P.2d 929 (Utah 1988) – a case that deals primarily with *voir dire* questions that should be in some cases put to potential jurors regarding their religious affiliations – the Utah Supreme Court explained, *id.* at 935, that the predecessor Utah statute (like §41-6a-407) made it clear that a livestock owner's negligence is not presumed.

defendant's livestock had escaped only four times during the 25 years immediately preceding the night in question." (*Id.*)

It appears, to say the least, that the evidence here is considerably stronger than was the plaintiff's evidence in Peterson or Rhiness. The Court may also in this connection find instructive two cases in which the Wyoming Supreme Court reversed summary judgment rulings in favor of defendant ranchers: Schwartz Roitz v. Kidman, 913 P.2d 431, 434 (Wyo. 1996); and Gilliland v. Steinhoefel, 521 P.2d 1350, 1351 (Wyo. 1974).

Mr. Bates makes much of the proposition that Mr. Bates should not be held liable for the acts of an unknown criminal actor. First of all, and as stated above, the Fehers are not making any such contention. Even if, for the sake of discussion, that unknown person committed a criminal act, that would not (as explained in the Kansas Cooper case cited and discussed at pages 15-16, above) mean that the Fehers are prohibited from pursuing their claim against Mr. Bates. And it is by no means certain, in any event and contrary to Mr. Bates's suggestion, that that unknown person committed a crime.

Mr. Bates claims, in the Introduction to his Memorandum, that the "gate was left open by a third-party in violation of Utah Code Ann. §4-26-4 (1979)." First, it is unclear whether the unknown person who left the gate open had himself or herself also opened the gate. That seems to be a requirement for a violation of that statute, the language of which is set forth on p. 4 of Mr. Bates's Memorandum. Mr. Bates also cannot show that any such act was done "willfully," and that is what that statute requires. As mentioned above, it was Mr. Lecch's own practice to leave a gate open that did not have a sign on it,

and presumably the gate in question had no sign. It is also unclear whether that statute even relates to public lands, such as those involved here, as opposed to private property.

The other statute cited by Mr. Bates -- Utah Code Ann. §72-7-106 -- does not seem to be applicable, if Mr. Bates's testimony is accurate, inasmuch as that statute applies to Class B and Class D roads and Mr. Bates has testified that the gate in question was neither a Class B nor a Class D road. Bates depo. at 124-25. And the Fehers have, in any event, never contended that Mr. Bates should have locked the gate. The Fehers concede that it would have been against the law for Mr. Bates to do so. The question is what steps Mr. Bates reasonably should have taken, other than locking the gate, that he did not take; and there is plenty of room, given the pertinent facts of this case, for a jury to find that he at a minimum failed to act reasonably in the circumstances.

Mr. Bates's argument is a "no-duty" argument. But the duty in question has been established by the Utah Legislature. The Fehers have pursued this case based not on the proposition that Mr. Bates failed to control the conduct of one or more unknown third parties, but on the proposition that he personally and/or through Mr. Leech at a minimum failed to take reasonable steps to keep his cows off the highway where they could cause harm and that such failure or failures led to the collision as results of which Mr. Feher has sustained serious, life-altering injuries and his wife, Virginia Feher, has sustained significant loss-of-consortium damages.

If the Court has any doubt about whether the evidence coming from Mr. Bates and Mr. Leech alone constitutes a triable question of fact, the Court should consider the

Affidavit of Virginia Feher (copy attached hereto as Exhibit B) regarding her post-incident observations. These observations, when compared with Mr. Bates's testimony (Bates depo. at 136) that his practices did not change after the incident, show something that will likely be of significant interest to the jury and that may be worth the Court's noting at this time.

Finally, if the Court is of the view (not shared by the Fehers) that expert testimony is necessary to carry a case of this nature to a jury (something that did not seem to be an issue in the Tenth Circuit <u>Peterson</u> case discussed above), the Court should consider the report of Thomas Stoll, an apparently eminently qualified expert (Mr. Stoll's c.v. is attached hereto as Exhibit K and, as mentioned above, his report is attached hereto as Exhibit J).

The Court should deny defendant's Motion for Summary Judgment.

Respectfully submitted this ___23rd___ day of February, 2009.

_____
PETER C. COLLINS
PETER C. COLLINS, L.L.C.
Attorney for Plaintiffs


CERTIFICATE OF SERVICE

I hereby certify that, on the _23rd_ day of February, 2009, I caused to be served a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM IN

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT by the

method indicated below, and addressed to the following:

John R. Lund
Murry Warhank
SNOW, CHRISTENSEN &
MARTINEAU
10 Exchange Place, #1100
Salt Lake City, UT  84145

| | |
|---|---|
| ___ | HAND-DELIVERY |
| _X_ | U.S. MAIL |
| ___ | OVERNIGHT MAIL |
| ___ | TELECOPY/FAX (363-0400) |
| ___ | E-MAIL (intakeclerk@scmlaw.com) |
| ___ | E-MAIL (mwarhank@scmlaw.com) |